UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
PIKEVILLE

| | |
|---|---|
| MELINA WILEY, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 7:21-CV-44-REW |
| ) | |
| KILOLO KIJAKAZI, Acting Commissioner ) | |
| of Social Security, ) | OPINION & ORDER |
| ) | |
| Defendant. ) | |

\*\*\* \*\*\* \*\*\* \*\*\*

Melina Wiley appeals the denial of her application for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI). *See* DE 1 (Complaint). The parties filed dueling summary judgment motions. DE 15 (Plaintiff's Motion for Summary Judgment); DE 21 (Defendant's Motion for Summary Judgment). The full record appears at DE 12-1 (Administrative Transcript). The Court, having considered the full record under governing law, **GRANTS** the Commissioner's motion (DE 21) and **DENIES** Miley's motion (DE 15). Substantial evidence supports the findings underpinning the administrative ruling, and there is no nexus between Judge Meade's decision and the questionable removal restriction under *Seila Law, LLC v. Consumer Fin. Prot. Bureau*, 140 S. Ct. 2183, (2020).

I.  FACTUAL BACKGROUND AND PROCEDURAL HISTORY

On January 8, 2019, Wiley applied for DIB and SSI. R. at 250–59. Wiley alleged that the following conditions rendered her legally disabled and unable to work as of April 27, 2015: "Fibromyalgia, Neuropathy, Chronic migraines, Degenerative disc[] disease, Depression, Anxiety, Scoliosis, High blood pressure, High cholesterol, Chronic constipation, Gerd, Lack of

1

concentration, Memory loss, Hallucinations, Back pain, Muscle spasms, Feet pain, [and] Leg pain[.]" *Id.* at 93. After an initial review, experts at Social Security denied the claims. *Id.* at 108, 126. Upon request for reconsideration, another set of experts reconsidered the claims and again concluded that Wiley was not disabled. *Id.* at 150, 170. Wiley appealed that finding, resulting in a hearing before Administrative Law Judge (ALJ) Jerry Meade. *Id.* at 46–67 (Transcript of Hearing). After a hearing and full review, Judge Meade concluded that Wiley "has not been under a disability as defined in the Social Security act, from March 10, 2018, through the date of [his] decision[.]"[1] *Id.* at 179. In his decision, the ALJ made the following findings consistent with the codified five-step evaluation sequence. *Id.* at 27–38.

At step one, Judge Meade found that Wiley "has not engaged in substantial gainful activity since March 10, 2018." R. at 27. At step two, the judge then found that Wiley "has the following severe impairments: obesity; degenerative disc disease; migraines; 'mild' peripheral neuropathy; inflammatory polyarthropathy; depression; bipolar disorder; anxiety; and post-traumatic stress disorder." *Id.* at 28. Relevant to this appeal, he found Wiley's hypertension, gastroesophageal reflux disease, memory loss, hallucinations, Sjogren's syndrome/Sicca syndrome, and borderline personality disorder were non-severe impairments. *Id.* at 28–29. Judge Meade found that Wiley's reported scoliosis and fibromyalgia were not medically determinable impairments. *Id.* at 29. At step three, Judge Meade determined that Wiley lacks "an impairment or combination of

---

[1] The decision evaluated Wiley's alleged onset date as it related to a prior disability adjudication period. R. at 24–25. Judge Meade found no justification to reopen Wiley's prior application. *Id.* at 25. Therefore, Judge Meade found that "the relevant period of time for the current . . . application is March 10, 2018 (the day after the prior decision was issued) to the date of this decision." *Id.* at 25. Wiley does not in any way challenge the analysis.

2

impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1[.]" *Id.* at 29.

At step four, Judge Meade defined Wiley's Residual Functional Capacity (RFC) after "careful consideration of the entire record," including a prior and final ALJ determination. R. at 31. Judge Meade considered the full array of Wiley's claimed symptoms and the extent to which those symptoms were consistent with other relevant medical evidence, pursuant to 20 C.F.R. §§ 404.1529 and 416.929 and SSR 16-3p.[2] R. at 31. He found the degree of Wiley's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." *Id.* at 34. The ALJ laced the full spectrum of the medical opinions into his analysis. *Id.* at 31–37. He found that Wiley could, under the regulatory definitions, perform a version of "light work[.]" *Id.* at 31. Judge Meade then applied these findings to the Medical-Vocational Guidelines and considered a vocational expert's testimony to determine that Wiley could not perform any past relevant work. *Id.* at 37; *see also* 20 C.F.R. § 416.920(a)(4)(iv).

At the fifth step, Judge Meade determined that "considering the claimant's age, education, work experience, and residual functional capacity, the claimant is capable of making a successful adjustment to other work that exists in significant numbers in the national economy." R. at 37. The ALJ relied partially on the vocational expert's testimony that Wiley could perform the requirements of representative occupations "at the light level as a sorter, . . . garment folder, . . . and produce weigher." *Id.* at 38. Judge Meade concluded that a "finding of 'not disabled' is therefore appropriate[.]" *Id.* at 38.

---

[2] SSR 16-3p (S.S.A.), 2017 WL 5180304 (Oct. 25, 2017).

Wiley petitioned the Appeals Council, which denied review on March 30, 2021. R. at 1–6. Wiley now turns to federal court, seeking judicial review of Judge Meade's decision under 42 U.S.C § 405(g). DE 1 (Complaint); DE 15 (Plaintiff's Motion and Memorandum in Support).

## II.     ANALYSIS

A. Standard of Review

The Court has carefully considered Judge Meade's decision, the transcript of the administrative hearing, and the pertinent administrative record. The Court has turned every apt[3] page, primarily focusing on the portions of the record to which the parties specifically cite.

Judicial review of an ALJ's decision to deny disability benefits is a limited and deferential inquiry into whether substantial evidence supports the denial's factual decisions and whether the ALJ properly applied relevant legal standards. *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009); *Jordan v. Comm'r of Soc. Sec.*, 548 F.3d 417, 422 (6th Cir. 2008); *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989) (citing *Richardson v. Perales*, 91 S. Ct. 1420, 1427 (1971)); *see also* 42 U.S.C. § 405(g) (providing and defining judicial review for Social Security claims) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive[.]").

Substantial evidence means "more than a scintilla of evidence, but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994); *see also Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004). The Court does not try the case *de novo*, resolve conflicts in the evidence, or revisit questions of credibility. *Bass v.*

---

[3] That is, those records relevant to the particular issues Wiley presents for review.

*McMahon*, 499 F.3d 506, 509 (6th Cir. 2007). Similarly, the Court does not reverse findings of the Commissioner or the ALJ merely because the record contains evidence—even substantial evidence—to support a different conclusion. *Warner*, 375 F.3d at 390. Rather, the Court must affirm the agency decision if substantial evidence supports it, even though the Court might have decided the case differently if in the ALJ's shoes. *See Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005); *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389–90 (6th Cir. 1999).

The Court's inquiry continues: "[E]ven if supported by substantial evidence, 'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where the error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)). When reviewing the ALJ's application of the legal standards, the Court gives deference to his interpretation of the law and reviews the decision for reasonableness and consistency with governing statutes. *See Whiteside v. Sec'y of Health & Human Servs.*, 834 F.2d 1289, 1292 (6th Cir. 1987). In a Social Security benefits case, the agency's construction of the statute should be followed "unless there are compelling indications that it is wrong." *Merz v. Sec'y of Health & Human Servs.*, 969 F.2d 201, 203 (6th Cir. 1992) (quoting *Whiteside*, 834 F.2d at 1292). The Court "must reverse and remand if the ALJ applied incorrect legal standards, even if the factual determinations are otherwise supported by substantial evidence and the outcome on remand is unlikely to be different." *Kalmbach v. Comm'r of Soc. Sec.*, 409 F. App'x 852, 859 (6th Cir. 2011) (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 545–46 (6th Cir. 2004)).

The ALJ, when determining disability, conducts the recognized five-step analysis. *See Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994); 20 C.F.R. §§

5

404.1520(a)(4), 416.920(a)(4). The "standard of review for supplemental security income cases mirrors the standard applied in social security disability cases." *Bailey v. Sec'y of Health & Human Servs.*, 922 F.2d 841, No. 90-3265, 1991 WL 310, at *3 (6th Cir. Jan. 3, 1991) (table); *see also Roby v. Comm'r of Soc. Sec.*, No. 12-10615, 2013 WL 451329, at *3 (E.D. Mich. Jan. 14, 2013) ("The standard for disability under both the DIB and SSI programs is virtually identical."), *adopted* 2013 WL 450934 (E.D. Mich. Feb. 6, 2013). At Step 1, the ALJ considers whether the claimant is performing substantial gainful activity. *See Preslar*, 14 F.3d at 1110; 20 C.F.R. § 416.920(a)(4)(i). At Step 2, the ALJ determines whether one or more of the claimant's impairments are severe. *Preslar*, 14 F.3d at 1110; 20 C.F.R. § 416.920(a)(4)(ii). At Step 3, the ALJ analyzes whether the claimant's impairments, alone or in combination, meet or equal an entry in the Listing of Impairments. *Preslar*, 14 F.3d at 1110; 20 C.F.R. § 416.920(a)(4)(iii). At Step 4, the ALJ defines RFC and considers whether the claimant can perform past relevant work. *Preslar*, 14 F.3d at 1110; 20 C.F.R. § 416.920(a)(4)(iv). The inquiry at this stage (if applicable) is whether the claimant can still perform that type of work, not necessarily the specific past job. *See Studaway v. Sec'y of Health & Human Servs.*, 815 F.2d 1074, 1076 (6th Cir. 1987). Finally, at Step 5, when the production burden shifts to the Commissioner, if the claimant cannot perform past relevant work, the ALJ determines whether significant numbers of other jobs exist in the national economy that the claimant can perform, given the applicable RFC. *See Preslar*, 14 F.3d at 1110; 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4)(iv). If the ALJ determines at any step that the claimant is not disabled, the analysis ends at that step. *Mowery v. Heckler*, 771 F.2d 966, 969 (6th Cir. 1985); 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

Wiley presents two arguments: (1) Judge Meade improperly evaluated Wiley's claim of fibromyalgia as an impairment, and (2) Judge Meade lacked authority to decide Wiley's claim due

to structural invalidity in the SSA. DE 15 at 4, 9. The Court now addresses, and rejects, each in turn.

  B. Judge Meade did not reversibly err when he determined that fibromyalgia was not a medically determinable impairment in this case.

Wiley first argues that Judge Meade incorrectly found Wiley's fibromyalgia unproven as a medically determinable impairment. DE 15 at 4–7. "In many disability cases, the cause of the disability is not necessarily the underlying condition itself, but rather the symptoms associated with the condition." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007). So too with fibromyalgia: "[C]laims related to fibromyalgia are related to the *symptoms* associated with the condition[.]" *Kalmbach v. Comm'r of Soc. Sec.*, 409 F. App'x 852, 862 (6th Cir. 2011). The ALJ employs a two-part analysis. *See id.* (citing 20 C.F.R. § 416.929(a)). First, the ALJ determines whether the claimant has a "medically determinably impairment," like fibromyalgia, and if so, whether the impairment "could reasonably be expected to produce the pain or other symptoms alleged." 20 C.F.R. § 416.929(a). Second, the ALJ must "evaluate the intensity and persistence of the person's pain or any other symptoms and determine the extent to which the symptoms limit the person's capacity for work." 20 C.F.R. § 416.929(c)(1). Wiley focuses her attack on step one.

Judge Meade's step one fibromyalgia conclusion rested on two findings. First, against the SSR 12-2p analytical backdrop, he discounted Dr. Sujata Gutti's examination notes because Dr. Gutti "failed to identify the exact number of tender points." R. at 29. Second, Judge Meade discounted Dr. Bill Web's diagnosis because his "treatment notes from that appointment contain no objective findings." *Id.* In total, the two diagnoses "fail[ed] to satisfy the criteria set forth in SSR 12-2p." *Id.*

7

Wiley points to a third diagnosis allegedly ignored by the ALJ: Dr. Zialluah Virk's diagnosis of fibromyalgia on February 28, 2020. Wiley argues that Judge Meade's failure to find fibromyalgia as a medically determinable impairment "necessitated that he improperly weigh the treating physician opinions and discount Ms. Wiley's testimony. . .. Therefore . . . his decision in this regard did not meet the requirements of 20 C.F.R. § 416.927, and therefore cannot serve as substantial evidence." R. at 7. For a cascade of reasons, Wiley's claim fails.

First, Wiley's argument posits a fallacious reading of the regulations. Per her brief, Wiley assails Judge Meade's decision as in violation of 20 C.F.R. § 416.927. DE 15 at 7. That regulation clearly does not apply. "For claims filed . . . before March 27, 2017, the rules in this section apply." 20 C.F.R. § 416.927. "For claims filed on or after March 27, 2017, the rules in § 416.920c apply." *Id.* Wiley's claim was filed on January 8, 2019. R. at 250–59. Therefore, § 416.920c would apply to medical opinions and prior administrative medical findings in Wiley's case.

Dr. Virk's notes, however, do not even qualify as an "opinion" to be evaluated under § 416.920c. The regulations break down medical evidence into three categories: objective medical evidence, medical opinions, and other medical evidence. *See* 20 C.F.R. § 416.913(a)(1)–(3). "Objective medical evidence is medical signs, laboratory findings, or both, as defined in § 416.902(k)." 20. C.F.R. § 416.913(a)(1). "A medical opinion is a statement from a medical source about *what you can still do despite your impairment(s)* and *whether you have one or more impairment-related limitations or restrictions*[.]" 20 C.F.R. § 416.913(a)(2) (emphasis added). Finally, "[o]ther medical evidence is evidence from a medical source that is not objective medical evidence or a medical opinion, including judgments about the nature and severity of your impairments, your medical history, clinical findings, diagnosis, treatment prescribed with response, or prognosis." 20 C.F.R. § 416.913(a)(3).

Dr. Virk's treatment notes are found at Exhibit B21F. R. at 1014–33. The notes cover two visits: one on February 6, 2020, and another on February 28, 2020. *Id.* at 1014–24 (Feb. 6 visit); *Id.* at 1025–33 (Feb. 28 visit).[4] Dr. Virk's notes contain objective medical evidence and other medical evidence. The notes do not contain a medical opinion on Wiley's capabilities or impairment-related limitations or restrictions. Thus, Dr. Virk's examination notes receive no special deference nor extra analytical care under 20 C.F.R. § 416.920c.

The ALJ did not discuss Dr. Virk's stray reference to fibromyalgia in the decision. He was under no duty to discuss *every* piece of evidence. *See Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 507–508 (6th Cir. 2006) ("While it might be ideal for an ALJ to articulate his reasons for crediting or discrediting each medical opinion, it is well settled that[ ] '[a]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party.'" (quoting *Loral Defense Systems-Akron v. N.L.R.B.*, 200 F.3d 436, 453 (6th Cir. 1999)). Regardless, ALJ Meade's decision did not completely ignore Dr. Virk; he cited and relied upon Dr. Virk's evidence. *See* R. at 28 (citing B22F); *id.* at 33 (citing Exhibit B21F); *id.* at 34 (same). Additional references to B21F and B22F occurred, and the ALJ confirmed consideration of the entire record. *Id.* at 29.

---

[4] Exhibit B22F appears to be a copy of Dr. Virk's treatment notes with the attached referral to Dr. Virk. *See* R. at 1034–42 (Feb. 28 visit); *Id.* at 1043–53 (Feb. 6 visit); *Id.* at 1054–57 (Referral). The records are identical except for instances in which the scanning of B21F was cut off. In those cases, the B22F scanning provides the missing pieces. The hearing transcript references exhibits only reaching B21F. *Id.* at 52 ("Those have been added to the record, which now contains exhibits marked B1A to B9A, B1B to B12B, B1D to B7D, B1E to B18E, and B1F to B21F."). Wiley's attorney did not object. *Id.* In Judge Meade's decision, however, he does cite to B22F as providing evidence of a Sjogren's Syndrome/Sicca Syndrome diagnosis. *Id.* at 28. The parties do not discuss this minor evidentiary discrepancy, and the Court sees nothing in the duplication that would change the analysis. Notably, Judge Meade accepted the Virk records although they were tardily tendered at the hearing. Plainly, he was aware of and assessed those materials.

Third, the determination that Wiley's claimed fibromyalgia is not medically determinable on this record was supported by substantial evidence and made pursuant to the proper regulations. "We cannot rely upon the physician's diagnosis alone. The evidence must document that the physician reviewed the person's medical history and conducted a physical exam." SSR 12-2p, 2012 WL 3104869 at *2 (SSA July 25, 2012). "We will review the physician's treatment notes to see if they are consistent with the diagnosis of [fibromyalgia], determine whether the person's symptoms have improved, worsened, or remained stable over time, and establish the physician's assessment over time of the person's physical strength and functional abilities." *Id.* To find fibromyalgia to be a medically determinable impairment, the ALJ must find three things. First, there must be "[a] history of widespread pain . . . that has persisted (or that persisted) for at least 3 months." *Id.* Second, "[a]t least 11 positive tender points" must be found on a physical examination. *Id.* Finally, there should be "[e]vidence that other disorders that could cause the symptoms or signs were excluded." *Id.*

Dr. Virk's notes reflect but two encounters with Wiley. In the first visit, Dr. Virk noted that Wiley complained of pain, stiffness, and fatigue. R. at 1014. The physical examination showed only "10 of 18 total tender points." *Id.* at 1051. At the conclusion of the visit, Dr. Virk diagnosed Wiley with autoimmune disease contributing to Wiley's chronic pain, spasms, and joint pain. *Id.* He also diagnosed Wiley with inflammatory polyarthropathy, low back pain, and "myalgia".[5] *Id.*

---

[5] "Myalgia" is a generic medical term for muscle pain regardless of cause or source. *See Myalgia*, Stedman's Medical Dictionary (2014) (defining myalgia as "[m]uscular pain"). "Fibromyalgia", by contrast, is a medical condition where a patient suffers from chronic muscle pain. *See Fibromyalgia*, Stedman's Medical Dictionary (2014) (defining fibromyalgia as "[a] common syndrome of chronic widespread soft-tissue pain accompanied by weakness, fatigue, and sleep disturbances; the cause is unknown").

Notably, the musculoskeletal exam was fully normal, and Wiley's connective tissue problems did not span each quadrant of the body. *Id.*

On the second visit, less than a month later, Dr. Virk noted that Wiley still complained of similar symptoms. *Id.* at 1025. However, Dr. Virk noted that neurological reports had yet to be performed or reviewed. *Id.* (noting that Wiley's "neurologist has CT scan" and "will get report"). Dr. Virk, after another normal musculoskeletal review, noted 12 out of 18 total tender points during a physical examination. *Id.* at 1030. Again, the exam did not blanket each bodily quadrant. Finally, he diagnosed Wiley with Sicca syndrome, polyarthritis, and fibromyalgia. *Id.* Dr. Virk notes that his discussions with Wiley focused mainly on the effects of Plaquenil, the drug that he prescribed for the Sicca syndrome. *Id.* There is no discussion of how or why Dr. Virk reached the fibromyalgia diagnosis. At the least, Dr. Virk's notes do not show that he reviewed all of Wiley's medical records. Moreover, the three-week gap between the initial visit and the tertiary fibromyalgia diagnosis does not show a systematic exclusion of other ailments or show "the physician's assessment over time of the person's physical strength and functional abilities." SSR 12-2p at *2; *compare* R. at 1021 (Feb. 6 Musculoskeletal Examination) (noting all points normal inspection with normal range of motion) *with Id.* at 1029 (Feb. 28 Musculoskeletal Examination) (same). The ALJ cited and relied on Virk's records in part, but he plainly did not view the records as additive on the fibromyalgia review.

Even if Judge Meade found Wiley's fibromyalgia to be a medically determinable impairment, this would not entitle Wiley to relief. "[T]he diagnosis of a condition, alone, is not disabling." *Bottom v. Kijakazi*, No. 5:19-CV-450-JMH, 2021 WL 3269256, at *2 (E.D. Ky. July 30, 2021) (citing *Bernal v. Bowen*, 851 F.2d 297, 301 (10th Cir. 1988)). Here, more specifically, "a diagnosis of fibromyalgia does not equate to a finding of disability or an entitlement to benefits."

11

*Stankosi v. Astrue*, 532 F' App'x 614, 619 (6th Cir. 2013); *see also Vance v. Comm'r of Soc. Sec.*, 260 F. App'x 801, 805 (6th Cir. 2008) ("Nonetheless, a *diagnosis* of fibromyalgia does not automatically entitle [claimant] to disability benefits; particularly so here, where there is substantial evidence to support the ALJ's determination that [claimant]'s fibromyalgia was either improving or, at worst, stable.").

Wiley makes no attempt to attack ALJ Meade's final RFC determination. Wiley does not wrestle with how an erroneous fibromyalgia analysis contributed to the RFC. The second step in the disability determination process serves "to 'screen out totally groundless claims'" of disability. *Anthony v. Astrue*, 266 F. App'x 451, 457 (6th Cir. 2008) (quoting *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 89 (6th Cir. 1985)).[6] Here, the ALJ, though not finding fibromyalgia proven, did encompass the full record, including the notes and examinations of Dr. Virk. In fact, the ALJ clearly referenced Dr. Virk's treatment notes when fashioning the final RFC. *See* R. at 33 (citing Exhibit B21F); *id.* at 34 (same). The RFC also accounts for all of Wiley's impairments; the ALJ determined that Wiley could not return to her previous work, and the constellation of impairments directly formed the RFC. *Id.* at 37, 31. The RFC was supported by substantial evidence and remains unchallenged.

Wiley leans heavily on *Rogers* to support her position. *Rogers* is distinguishable. There, the ALJ did not follow "the process for diagnosing fibromyalgia involv[ing] testing for tenderness

---

[6] In most cases, this means that it is irrelevant if some impairments were found severe and some were not. If the ALJ passes step two, the judge then goes on to consider "severe and nonsevere impairments in the remaining steps of the sequential analysis." *Anthony*, 266 F. App'x at 457. "Since the Secretary properly could consider claimant's [remaining conditions] in determining whether claimant retained sufficient residual functional capacity to allow [her] to perform substantial gainful activity, the Secretary's failure to find that claimant's [other conditions] constituted severe impairment[s] could not constitute reversible error." *Maziarz v. Sec' of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987).

in focal points," while the record reflected an increasing number of "medically-accepted and recognized signs of fibromyalgia." *Rogers*, 486 F.3d at 243–45. The concern in *Rogers* was centered on the proper analysis of a claim of fibromyalgia—not on the diagnostic impact on the final RFC. Here, the ALJ referenced the appropriate regulation, a regulation that post-dates and complies with *Rogers*. There is no indication in ALJ Meade's decision that he improperly analyzed claims of fibromyalgia. Although he did not parse the Virk records, the hearing and decision show that Judge Meade accounted for those records in making his determinations. Further, the symptoms and findings from Dr. Virk's encounters plainly flowed through into the impairment findings (*e.g.*, inflammatory polyarthropathy (severe) and Sicca Syndrome (non-severe)) and resulting erosion of abilities as shown in the RFC, which Wiley does not gainsay.

In sum, Judge Meade cogently considered the full record. He analyzed medical evidence, weighed testimony, and appropriately accounted for all materials to reach his conclusions. Judge Meade properly applied the relevant legal standards, and substantial evidence girds his decision. *Blakley*, 581 F.3d at 405; *Jordan*, 548 F.3d at 422; *Brainard*, 889 F.2d at 681; *see also* 42 U.S.C. § 405(g). Wiley's complaint is simply in the details of one sub-finding on the roster of impairments. The ALJ's decision reflects consideration of the subject records but also shows that any failure to recite the proof was not, in any way, an error that affected the result. The decision was proper.

C. *Seila Law* does not implicate or impact Judge Meade's decision.

Wiley next challenges Judge Meade's decision as constitutionally deficient under *Seila Law*. *See* DE 15 at 7–8.[7] The theory is that an invalid limit on removal of the Commissioner

---

[7] In *Seila Law*, the Supreme Court held that Congress may not limit the removal of an agency's single-director leader to only instances of "inefficiency, neglect of duty, or malfeasance of office." *Seila Law*, 140 S. Ct. at 2197. The Court noted in dicta that the SSA commissioner model is a

somehow taints all decisions of a Commissioner properly appointed. As a remedy, Wiley asks the Court to vacate and remand Judge Meade's decision.

It is important at the outset to distinguish between traceability required for standing purposes and traceability required for retrospective relief. Of course, Wiley must have Article III standing to make a constitutional claim. *See generally Lujan v. Defenders of Wildlife*, 112 S. Ct. 2130, 2136 (1992). "To establish Article III Standing, a plaintiff must show that it has suffered an 'injury in fact' that is 'fairly traceable' to the defendant's conduct and would likely be 'redressed by a favorable decision.'" *Collins v. Yellen*, 141 S. Ct. 1761, 1779 (2021) (quoting *Lujan*, 112 S. Ct. at 2136)). For standing purposes, the Court must analyze "whether the plaintiff's injury can be traced to 'allegedly unlawful conduct' of the defendant, not to the provision of law that is challenged." *Id.* (quoting *Allen v. Wright*, 104 S. Ct. 3315, 3324 (1984)). For retrospective relief, however, such allegations are insufficient. *See id.* at 1788 n.24. Rather, as to that question, a plaintiff must demonstrate that the claimed unconstitutional provision actually harmed the claimant. *See id.* Thus, for example, if the removal limitation thwarted the President, then continuing acts by the protected Commissioner could yield traceable harm.

Some courts have previously found Article III standing for challenges like Wiley's. *See, e.g., Dixie C. v. Kilolo Kijakazi*, No. 3:21-cv-764-G-BN, 2021 WL 4822838 at *5 6 (N.D. Tex. Sep. 20, 2021); *but see Helms v. Comm'r of Soc. Sec.*, No. 3:20-cv-589-MOC, 2021 U.S. Dist. LEXIS 230193, at *4 5 (W.D.N.C. Dec. 1, 2021). But, even if Wiley's harm is sufficiently traceable to confer Article III standing, that would not entitle her to relief, as the Supreme Court

---

structural analog to the Consumer Financial Protection Bureau. *Id.* at 2202. The Commissioner concedes that the removal restriction codified in 42 U.S.C. § 902(a)(3) "violates the separation of powers to the extent it . . . limit[s] the president's authority to remove the commissioner without cause." *See* DE 21 at 3.

14

made clear in *Collins*. *See Collins*, 141 S. Ct. 1761, at 1788 n.24 ("[A] plaintiff that challenges a statutory restriction on the President's power to remove an executive officer can establish standing by showing that it was harmed by an action that was taken by such an officer and that the plaintiff alleges was void. . . . But that holding on standing does not mean that actions taken by such an officer are void *ab initio* and must be undone") (italics in original).

The Supreme Court in *Collins* stressed "that the unlawfulness of the removal provision does not strip the Director of the power to undertake other responsibilities of his office." *Collins*, 141 S. Ct. at 1788 n.23. Thus, in *Collins*, the Supreme Court refused to void automatically agency action undertaken by a lawfully *appointed* Director while operating under an unconstitutional *removal* provision. *See id.* The Court counselled that retrospective relief, therefore, requires that the plaintiff demonstrate harm traceable directly to the unconstitutional removal provision. *See id.* at 1788–89. Although Wiley generically makes a *Seila Law* complaint, Wiley does not discuss *Collins* or in any manner link the removal deficit to any action relevant to her case. She is not entitled to retrospective relief.

Both Wiley and the Commissioner agree that "the ALJ in Ms. Wiley's case was appointed by the Acting Commissioner of SSA [Berryhill]." DE 15 at 8; *see also* DE 21 at 6. After becoming Acting Commissioner, Berryhill ratified Judge Meade's appointment on July 16, 2018. *See* SSR 19-1p, 2019 WL 1324866 at *2. The Court finds, consistent with other courts, that as Acting Commissioner, Berryhill was not subject to the (concededly) unconstitutional removal restrictions in 42 U.S.C. § 902(a)(3). *See, e.g.*, *Boger v. Kijakazi*, No. 1:20-CV-00331-KDB, 2021 WL 5023141, at *3 n.4 (W.D.N.C. Oct. 28, 2021) (treating removal limitation as likely inapplicable to

15

Acting Commissioner).[8] The unconstitutional "for cause" removal restriction in section 902(a)(3) is notably absent from the subsection (b)(4)—the provision for filling the Commissioner's vacancy with an "Acting Commissioner." *See* 42 U.S.C. § 902(b)(4). It is also absent from President Obama's December 23, 2016, Memorandum providing a method for filling the SSA Commissioner vacancy—the memorandum under which Berryhill was ultimately appointed as Acting Commissioner.[9] *See* Memorandum of December 23, 2016, *Providing an Order of Succession Within the Social Security Administration*, 81 Fed. Reg. 96337, 96337, 2016 WL 787744 (Dec. 23, 2016); *see also* U.S. Gov't Accountability Off., B-329853, *Violation of the Time Limit Imposed by the Federal Vacancies Reform Act of 1998—Commissioner, Social Security Administration*, (March 6, 2018).

As the Supreme Court emphasized, "[w]hen a statute does not limit the President's power to remove an agency head, we generally presume that the officer serves at the President's pleasure," and when "Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposefully in the disparate inclusion or exclusion." *Collins*, 141 S. Ct. at 1782 (quoting *Barnhart v. Sigmon Coal Co.*, 122 S. Ct. 941, 951 (2002)). Here, both scenarios contemplated by the Supreme Court in *Collins* counsel that Berryhill was removable at will by the President. *See*

---

[8] Under the unconstitutional removal provision, the President could only remove the Commissioner of Social Security upon finding "neglect of duty or malfeasance in office." 42 U.S.C. § 902(a)(3).

[9] Former President Obama, under the Federal Vacancies Reform Act, issued a memorandum in 2016 providing the order of succession for the Social Security Commissioner upon vacancy. *See* Memorandum of December 23, 2016, *Providing an Order of Succession Within the Social Security Administration*, 81 Fed. Reg. 96337, 96337, 2016 WL 787744 (Dec. 23, 2016). That memorandum authorized the Deputy Commissioner for Operations as the first-in-line to fill the vacancy. *See id.*

*Collins*, 141 S. Ct. at 1783 (holding, based on the structure and text, "that the Recovery Act's removal restriction does not extend to an Acting Director").

The upshot is rejection of Wiley's argument for two reasons. First, the Acting Commissioner had no removal limitation and thus no *Seila Law* problem to begin with. Second, even if a *Seila Law* problem applies to the confirmed Commissioner, Wiley does not link the removal stricture to the Agency's decisions or actions in *this* case. The only Circuit to have addressed this argument in a published decision agrees with the last-stated analysis. *See Kaufmann v. Kijakazi*, 32 F.4th 843, 850 (9th Cir. 2022) ("In sum, we hold that the removal provision in 42 U.S.C. § 902(a)(3) violates separation powers; that the provision is severable; and that, unless a claimant demonstrates actual harm, the unconstitutional provision has no effect on the claimant's case."). Thus, the required *Collins* linkage between removal stricture and agency action, nowhere addressed in Wiley's brief, is absent.

### III.   CONCLUSION

For the stated reasons, the Court **GRANTS** DE 21 and **DENIES** DE 15. The Court will enter a separate Judgment.

This the 8th day of July, 2022.

Signed By:
*Robert E. Wier*  /s/ REW
United States District Judge